IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SCOTT C. P., | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | Civil Action No.  3:18-CV-00036-D-BH |
| | § | |
| NANCY A. BERRYHILL, ACTING, | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| **Defendant.** | § | Referred to U.S. Magistrate Judge |

<u>FINDINGS, CONCLUSIONS, AND RECOMMENDATION</u>

By *Special Order No. 3-251*, this social security appeal was automatically referred for full

case management.  Based on the relevant filings, evidence, and applicable law, the Commissioner's

decision should be **AFFIRMED.**

## I.  BACKGROUND

Scott C. P. (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social

Security (Commissioner) denying his claim for a period of disability and disability insurance

benefits (DIB) under Title II of the Social Security Act (Act). (doc. 13.)

### A.     <u>Procedural History</u>

On January 26, 2015, Plaintiff filed an application for a period of disability and DIB alleging

disability beginning on January 31, 2015.  (doc. 10-1 at 83.)[1]  His claim was denied initially on July

22, 2015, and upon reconsideration on November 3, 2015.  (*Id*. at 83, 94.)  On November 17, 2015,

he requested a hearing before an Administrative Law Judge (ALJ).  (*Id*. at 107.)  He appeared and

---

[1]  Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

testified at a hearing on July 7, 2016. (*Id*. at 40-72.) On January 12, 2017, the ALJ issued a decision finding that he was not disabled and denying his claim for benefits. (*Id*. at 18-36.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on February 9, 2017. (*Id*. at 155.) The Appeals Council denied his request for review on December 3, 2017, making the ALJ's decision the final decision of the Commissioner. (*Id*. at 5.) Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* docs. 1; 13.)

B.    **Factual History**

1.    **Age, Education, and Work Experience**

Plaintiff was born on March 13, 1964, and was 50 years old on the alleged onset date. (doc. 10-1 at 35.) He had at least a high school education and could communicate in English. (*Id*.) He had past relevant work as a landscape specialist, automobile repair service estimator, tire salesperson, store laborer, and emergency medical technician. (*Id*. at 34.)

2.    **Medical Evidence**

On September 17, 2013, Plaintiff saw Kenneth LeCroy, M.D., for a refill of medication. (*Id*. at 337.) He reported that he was doing well, but he had worsening symptoms. (*Id*.) Dr. LeCroy noted that Plaintiff suffered a gunshot wound to his head "many years ago" resulting in blindness in his right eye. (*Id*.) He had light vertigo that was occasionally getting worse and vision fades. (*Id.*) He also had shakes that felt like internal tremors, and he was worried that he could have Parkinson's disease. (*Id*.) His behavior, mood, and affect were appropriate, and he was in no distress, well-developed, well-nourished, alert, and oriented to person, place, and time. (*Id*.) He was diagnosed with stable depression, allergic rhinitis, and essential and other specified forms of tremors. (*Id*. at 338.) Dr. LeCroy suspected a traumatic brain injury from multiple concussions and

2

a gunshot wound, and he recommended that Plaintiff see a neurologist because an MRI would not be in his best interest due to pellets remaining inside his skull and outside his skull under the skin. (*Id.*) It was also recommended that he increase his physical activity and try to exercise 30 minutes a day at least 3-5 times per week. (*Id.* at 339.)

On February 9, 2015, Plaintiff saw Dr. LeCroy again, who diagnosed Plaintiff with organic brain syndrome with poor prognosis. (*Id.* at 332.) He stated that Plaintiff was unable to work and would require accommodations for his difficulty in social interaction, direct supervision, memory loss, trouble following directions, and having 3 or more sick days per month. (*Id.*) He noted that Plaintiff would get lost while driving, and that he forgot how to do procedures in his job. (*Id.*) He expected Plaintiff's impairments to last at least 12 months. (*Id.*)

On February 17, 2015, Plaintiff presented to Dr. LeCroy complaining of chronic headaches. (*Id.* at 335.) Plaintiff had resigned from his job in the prior month because he could not see well enough at night to work as an emergency medical technician (EMT), and he suffered vertigo. (*Id.*) Strobe lights made his symptoms worse, he would get lost driving, he had mood shifts resulting in outbursts, and his current memory was bad although his distant memory was intact. (*Id.*) It was noted that Plaintiff had worked 37 jobs since he was 18 years old. (*Id.*) He had a flat affect and tight mood, almost as if he was angry. (*Id.*) He was diagnosed with worsening other non-psychotic mental disease after organic brain damage, worsening memory loss, worsening mild cognitive impairment, and stable blindness in one eye. (*Id.* at 336.)

On February 19, 2015, Dr. LeCroy completed a residual functional capacity (RFC) form. (*Id.* at 326-31.) He noted that he was Plaintiff's primary care physician and saw him about 2-3 times per year. (*Id.* at 326.) Plaintiff had troubles in his chosen occupation, severe memory lapses,

including trouble remembering how to do specific procedures in his usual line of work, and trouble remembering directions, which caused him to get lost while driving. (*Id.*) His long-term memory was extremely intact, but his short-term memory was very inconsistent and sometimes wrong. (*Id.*) He had been calling people by the wrong names and had trouble remembering his address. (*Id.*) Dr. LeCroy diagnosed Plaintiff with organic brain syndrome that had been managed for many years, depression on an ongoing basis, and "probably some amount of anger and irritability." (*Id.*) Plaintiff's symptoms were getting worse, with mild cognitive impairment being a more worrisome and progressively developing symptom. (*Id.*) He noted that these diagnoses and steadily declining function were common with organic brain damage. (*Id.*) Plaintiff had only received Fluoxetine to treat his depression and anxiety. (*Id.* at 327.) Dr. LeCroy did not expect any significant improvement and suspected that Plaintiff would have ongoing mild decline. (*Id.*) He opined that Plaintiff's disability did not prevent him from standing for 6-8 hours or sitting upright for 6-8 hours, and it did not require him to lie down during the day. (*Id.* at 327-28.) Plaintiff's disability did not prevent him from performing certain motions such as lifting, pulling, or holding objects, and that Plaintiff did not have any limitations in bending, squatting, kneeling, or turning any parts of his body. (*Id.* at 329.) He did not think that Plaintiff's disability would prevent him from traveling alone because new technology for directions could give him years of independent driving. (*Id.*) He noted that Plaintiff had not had a true lost driving episode. (*Id.*) He suspected that there were more anger and interpersonal issues than Plaintiff discussed with him. (*Id.*) Dr. LeCroy opined that Plaintiff would not be able to continue or resume work at his current or previous employment because his symptoms would not get better, and he was a danger to the public in his condition. (*Id.* at 330.) He also could not identify any other work Plaintiff could do, and opined that his disability

4

was not likely to change. (*Id*.)

On March 16, 2015, in his Function Report-Adult, Plaintiff reported that he lived at home with his wife. (*Id*. at 245.) He believed his ability to work was limited because some days he had extreme headaches and vertigo, and some days he could not remember people, numbers, how to use equipment, or how to get around without GPS. (*Id*.) From the time he woke up until he went to bed, he would make his bed, brush his teeth and groom himself, and read his checklist for things to do for the day, including chores such as laundry, feeding the dog, and watering the flowers. (*Id*. at 246.) He did not take care of anyone else, but he did take care of a dog with help from his wife. (*Id*.) Before his condition, he could see clearly, remember things, and go out shopping. (*Id*.) Since his condition, he had some days with very bad headaches that affected his sleep. (*Id*.) He sometimes left the shower or sink on after using them, he would often leave the restroom without flushing the toilet, and he could not go shopping without someone with him because he would have to call someone to go get him due to his memory issues. (*Id*.) His wife prepped meals for him or he ate precooked meals, but he needed reminders for what to eat and how to heat up food, and he needed reminders for taking medications. (*Id*. at 246-47.) He could not use the stove, oven, or grill because he would leave them on, but he did do household chores and yard work based on a checklist. (*Id*. at 247-48.) He went outside daily and traveled by walking, driving a car, riding in a car, or riding a bicycle. (*Id*. at 248.) He could go out alone, but not to shopping malls or large places, and he did not go out shopping. (*Id*.) He could not pay bills, but he could count change, handle a savings account, and use a checkbook or money order. (*Id*.) His hobbies included working in the yard, restoring antiques, working on old cars, and helping at the fire station, and he performed these hobbies daily and weekly. (*Id*. at 249.) Headaches, blurred vision, and vertigo prevented him

5

from doing activities on some days. (*Id.*) He volunteered at the fire station and as an EMT on Mondays and sometimes Thursdays, and he went to the mailbox, fire station, and sometimes to a part time job on a regular basis. (*Id.*) He had problems getting along with others due to outbursts and anger issues. (*Id.* at 250.) He believed his conditions affected his abilities to reach, climb stairs, see, remember, complete tasks, concentrate, understand, follow instructions, and get along with others. (*Id.*) He followed written instructions well if he had a checklist or note. (*Id.*) He estimated that he had 37 jobs and had been fired from 20 of them due to outbursts, his temper, and assault. (*Id.* at 251.) He did not handle changes in routine well, and he could not be in large crowds due to his anxiety. (*Id.*)

On April 12, 2015, Dr. LeCroy completed a mental status report for Plaintiff. (*Id.* at 385-87.) He noted that Plaintiff had a history of organic brain syndrome that caused depression, anxiety, and impulse control disorder, as well as advancing mild cognitive disorder showing early dementia symptoms. (*Id.* at 385.) He had intact orientation, sharp and edgy mood, mildly obsessive but intact thought content, mildly impaired memory, impaired attention and concentration, and intact judgment. (*Id.* at 385-86.) Dr. LeCroy diagnosed Plaintiff with organic brain syndrome with no hope of improvement. (*Id.* at 386-87.) He added that Plaintiff's work involved focus, which he could not do, and that his condition would increasingly impair his ability to respond to workplace changes and stress. (*Id.* at 387.) He opined that Plaintiff could manage benefit payments in his own interest. (*Id.*)

On June 19, 2015, Pennissi Taylor, Ph.D., P.C., performed a psychological evaluation of Plaintiff. (*Id.* at 388-94.) Plaintiff complained of organic brain damage, memory issues, anxiety, depression, complete blindness in his right eye, severe headaches, and vertigo. (*Id.* at 388-89.) He

stated he had worsening memory loss and worsening organic brain damage that had been going on for 33 years and had accelerated in the prior 6 years. (*Id*. at 389.) He reported multiple closed head injuries before the age of 16, as well as a gunshot wound to the head when he was 17 that resulted in the loss of his right eye and brain swelling. (*Id*.) He felt depressed, and "every little thing [made him] teary eyed." (*Id*.) He had crying spells 3-4 times per week but denied experiencing suicidal or homicidal ideation. (*Id*.) He started having panic attacks when he was 19 years old and had two in the previous year due to being in large crowds. (*Id*.) He also reported chronic, constant anxiety, and stated that he worried about how to get home, needing to do yard work, and how his children were. (*Id*.) He began having anger outbursts when he was 18 or 19 years old, and he would yell, scream, and throw things once or twice a month, but he was always appropriate with family members. (*Id*.) He had been aggressive with another person on one occasion in the previous year, but never with family, and he only became aggressive when provoked. (*Id*.) He denied ever intentionally harming himself, and endorsed memory problems such as giving a wrong address. (*Id*.)

At home, Plaintiff had post-it notes to remind him of things he would forget to do, such as turning off the oven. (*Id*.) He reported initial insomnia and experienced intermittent waking 2-3 times per week, as well as headaches and nightmares. (*Id*.) He described his energy as "crazy good" and stated that he had a hard time sitting still. (*Id*.) He exercised by walking 4.6 miles daily, and lifting weights twice per week. (*Id*.) He had been taking Prozac since 1995 for depression and anxiety, and had been prescribed something for sleep in the past which he no longer took. (*Id*.) At the time of the appointment, he was prescribed Fluoxetine, Advil, and aspirin. (*Id*.) He indicated that his interaction with the general public was strained and had become worse over the prior 6 years. (*Id*. at 390.) He did not meet people easily and felt suspicious and distrustful of strangers.

7

(*Id.*) He had two close friends and had been a member of a volunteer fire department and ambulance service for 5 years. (*Id.*) He enjoyed working on cars, mowing the lawn, and cleaning. (*Id.*) He did chores around the house but would forget and leave things undone. (*Id.*) He cooked in the microwave because he would forget to turn the oven off, and he could take care of his own hygiene needs independently. (*Id.*) He could manage finances with his wife's assistance, but he had to keep a written record of expenses. (*Id.*) He also did not go shopping due to crowds, and he could not recall what he was supposed to get, so he would get "random things." (*Id.*) Dr. Taylor noted that Plaintiff had been fired from the majority of his jobs due to "outbursts, assault, missing work due to headaches, [and] medical." (*Id.* at 391.)

Plaintiff was oriented times 4 and described his mood as depressed, but his mood was good on the day of the evaluation. (*Id.*) His affect and mood were congruent, and overall he appeared relaxed and in a good mood. (*Id.*) Plaintiff underwent standardized testing, including the Wechsler Adult Intelligence Scale (WAIS), Wide Range Achievement Test (WRAT), and Wechsler Memory Scale (WMS).[2] (*Id.*) His results generally fell in the high average, average, or low average range of intelligence and academic functioning. (*Id.* at 391-94.) He demonstrated a significant weakness in his ability to perform mental math, however. (*Id.* at 392-93.) Dr. Taylor diagnosed him with mild cognitive disorder that was not otherwise specified, and a Global Assessment of Functioning (GAF) score of 61. (*Id.* at 394.) His prognosis was guarded for any significant cognitive or memory improvement, and Dr. Taylor noted that Plaintiff had the most difficulty with immediate and short-term memory. (*Id.*)

---

[2] The WAIS is designed to measure cognitive intellectual functioning. (doc. 10-1 at 391.) The WRAT is a brief assessment of individual achievement including word recognition, sentence comprehension, spelling, and math computation, as well as a reading composite. (*Id.* at 392.) The WMS provides a detailed assessment of clinically relevant aspects of memory function using both auditory and visual stimuli. (*Id.* at 393.)

On August 12, 2015, Plaintiff saw Dr. LeCroy complaining of migraines and a lump on his breast.  (*Id*. at 397.)  He was continuing to have headaches and wanted to know what to do about it.  (*Id*.)  He was diagnosed with other non-psychotic mental disorder after organic brain damage, depression, mild cognitive impairment, blindness in one eye, hypertrophy of breast, and vertigo of central origin.  (*Id*. at 398.)  Dr. LeCroy thought that Plaintiff should see a neurologist due to his headache issues and vertigo, which almost made him fall a few times. (*Id*.)  A trial of Topamax was initiated for headaches, and Plaintiff was referred for a psychological evaluation.  (*Id*.)

On September 28, 2015, Plaintiff underwent a neurological examination with Mark Adams, M.D.  (*Id*. at 401-02, 424-25.)  Dr. Adams noted Plaintiff had a remote history of a gunshot wound to his head and a series of concussive injuries that gave rise to a traumatic brain injury and disturbing behavior, along with complaints of vertigo and headaches.  (*Id*. at 401, 424.)  Plaintiff complained of fluctuating memory and concentration, vertigo, headaches, and psychiatric issues, including anger outbursts and depression.  (*Id*.)  His vertigo was not clearly positional and occurred at rest, in motion, or with no activity, such as rolling to the right or left side or bending over.  (*Id*.)  Regarding his memory, Plaintiff reported that some days he functioned well, and other days he had trouble remembering simple things.  (*Id*.)  He would leave the water running in the sink, and he did not cook or work in the kitchen out of concern for leaving the stove unattended and on.  (*Id*.)  Plaintiff reported that his headaches lasted anywhere from 6-24 hours and caused sensitivity to light and sound, but they headaches responded to a combination of Advil and baby aspirin.  (*Id*. at 402, 425.)  Dr. Adams recommended intense vestibular rehabilitation for Plaintiff's vertigo, psychiatric care, and cognitive therapy.  (*Id*. at 424.)  Dr. Adams also provided samples of medications to stop migraines and noted that if the medications did not provide relief, it would confirm that Plaintiff did

9

not have migraines.  (*Id*.)

On October 14, 2015, Plaintiff saw Dr. LeCroy for a follow-up appointment.  (*Id*. at 407.) He did not report any problems and stated that the migraine medications were not dramatically helpful.  (*Id*. at 407-08.)  Dr. LeCroy was concerned about Plaintiff's worsening cognitive abilities because they were becoming much worse in challenging situations or social situations, but there was a random component to it that he did not understand.  (*Id*. at 408.)  Plaintiff reported that he had good days and some very bad days, and sometimes he had trouble remembering what he was doing or why he was doing it.  (*Id*.)  He attended EMT classes to help keep his knowledge fresh but had not been able to work as an EMT since January, when he was finding himself unable to remember how to do certain procedures and almost got lost driving.  (*Id*.)  Topamax worsened his condition, so Dr. LeCroy stopped that medication and prescribed Namenda to see if it could help with his cognition.  (*Id*.)  He was diagnosed with blindness in his right eye, chronic post-traumatic headache, being overweight, single episode major depressive disorder, and mild cognitive impairment.  (*Id*.)

On February 15, 2016, Dr. Adams sent a letter regarding Plaintiff to Dr. LeCroy.  (*Id*. at 419-20.)  He noted that Plaintiff complained of intermittent difficulty with focus and concentration and intermittent problems with anger, depression, and outbursts, as well as complaints of headaches that did not respond to migraine medications.  (*Id*. at 419.)  He further noted that the intermittent nature of Plaintiff's complaints somewhat argued against a neuro-degenerative disorder such as frontotemporal dementia or Alzheimer's.  (*Id*.)  Dr. Adams suggested that Plaintiff undergo a CT scan of the brain to look for any significant interval changes over time.  (*Id*. at 420.)  Plaintiff was also strongly advised to consider undergoing an evaluation at a rehabilitation center for his cognitive and mood/behavioral issues.  (*Id*.)

On June 20, 2016, Plaintiff was seen again by Dr. LeCroy because he was experiencing forgetfulness. (*Id*. at 411-13.) Dr. LeCroy noted that he previously diagnosed Plaintiff with organic brain syndrome or frontotemporal dementia because of a gunshot wound he sustained earlier in life. (*Id*. at 410.) Plaintiff had become lost a few times while driving, although he still drove 7 miles to his mail box, and he was having more and more forgetfulness as well as severe pain with headaches. (*Id*. at 411.) Plaintiff's medications were altered, and Dr. LeCroy noted that Plaintiff underwent formal psychological testing in which "he did very poorly with a 14/30, which [was] a terrible number." (*See id*. at 411, 415-18.) He found that Plaintiff's syndrome was in a rapidly advancing state with profound dementia. (*Id*. at 410.) He did not anticipate Plaintiff ever regaining meaningful employment due to his condition. (*Id*.) Plaintiff was no longer able to drive because he would become lost while driving, and he had wandering episodes, as well as significant problems with interpersonal relationships because of anger and inappropriate behavior. (*Id*.) Dr. LeCroy noted that these were symptoms of late stage dementia. (*Id*.) He stated that Plaintiff was disabled, and there was little that could be done from a medical perspective to improve his condition. (*Id*.) Plaintiff was diagnosed with worsening other frontotemporal dementia, worsening chronic post-traumatic headache, and blindness in his right eye. (*Id*. at 412.)

On July 5, 2016, John W. Beaty, Ph.D., P.C., completed a psychological evaluation for Plaintiff. (*Id*. at 426-31.) Plaintiff reported that he suffered a gunshot wound when he was 17 years old, which caused him to experience impulsivity and temper outbursts and lose many jobs over his lifetime. (*Id*. at 426.) He stated that he had 47 jobs with various companies since he was 18 years old, and he had either been fired or resigned due to conflicts with others. (*Id*.) His condition had worsened as he grew older. (*Id*.) He worked with Texas Parks and Wildlife for about 3 years before

leaving due to altercations with individuals and then worked as an EMT. (*Id.*) While working as an EMT, he did fairly well some days but had other days where he could not remember what he was doing or where he was going. (*Id.*) He had frequent headaches that were not migraines, but doctors could not find a solution for him. (*Id.* at 427.) He also experienced chronic vertigo, which was incapacitating some days. (*Id.*) He was forgetful and had problems with other people in public. (*Id.*) If someone touched him unexpectedly, he could have temper outbursts, and although he had assaulted a number of people, he had not had any legal charges filed against him. (*Id.*) He lived with his daughter and his wife, and his daughter looked after him to ensure that he would not do anything dangerous. (*Id.*) He did not cook because he might forget to turn off the burners of the stove or leave the water running, and he had wandered outside at night before and been found sleeping outside the next day. (*Id.*) Dr. Beaty noted that Plaintiff's doctors had previously diagnosed him with organic brain syndrome and chronic traumatic encephalopathy, which were getting worse. (*Id.*)

At the evaluation, Plaintiff appeared disoriented and was not very communicative at first. (*Id.* at 428.) Initially, his daughter did most of the talking, but then Plaintiff began talking more. (*Id.*) He became more goal directed and coherent as he talked, and his mood continued to be anxious and tense. (*Id.*) He underwent testing; he tried to complete some of it as quickly as he could but would quickly give up on other parts when he could not persevere or problem solve. (*Id.*) On days he was not doing well, he would go to Walmart and forget why he was there or which car he drove, and he mostly did not go out and do things. (*Id.*) He did drive to the nearby fire station, where he could attend an EMT class or help out, and he usually helped out on Tuesdays and Thursdays. (*Id.*) He had vertigo which kept him from being active, and his medication for it made

12

him sick. (*Id.*) On a typical day, he would walk and feed the dogs, make coffee, and read the news, and he could also do laundry, wash dishes, mow the lawn, and work on little things in the garage. (*Id.*) On days he did not feel well, he would only use the computer, watch television, and sleep. (*Id.*) His headaches could be as severe as an 8-9 on the pain scale, and sometimes he would have a sharp pain in his head that only lasted for a second. (*Id.*) He drank a couple of times a week, usually when he was feeling bad or depressed, but he did not pose problems and or get angry when he did. (*Id.*)

Plaintiff completed a Brief Symptom Inventory with the help of his daughter and rated 37 of 53 symptoms as positive, and most of them extreme. (*Id.*) Dr. Beaty found that this could reflect that Plaintiff experienced his symptoms in an extreme manner much of the time. (*Id.*) Compared to a non-patient normative population, Plaintiff had 4 of the clinical scales at an extreme level, and 7 of the scales at a clinically significant level. (*Id.*) His physical complaints scale was not significant, but it was in the upper average range. (*Id.*) His most extreme clinical scales were for obsessive-compulsive, interpersonal sensitivity, anxiety, hostility, phobias, and psychoticism. (*Id.*) All of his stress scales were significant, which indicated that he experienced a great deal of chronic stress, and his depression and paranoia scales were barely clinically significant. (*Id.* at 428-29.) In summary, Plaintiff experienced chronic levels of stress, anxiety, avoidance of certain situations, and feeling alienated and socially isolated. (*Id.* at 429.)

Dr. Beaty also administered the Shipley Institute of Living Scale test.[3] (*Id.*) Plaintiff finished both portions very quickly and was quick to say that he could not complete some of the items. (*Id.*) His score on the vocabulary portion was in the bottom 1 percent of the normal results,

---

[3] The Shipley Institute of Living Scale is a neurocognitive screening test consisting of a vocabulary or verbal portion and an abstract reasoning portion. (doc. 10-1 at 429.)

and his abstract reasoning score was in the 18th percentile.  (*Id*.)  His scores indicated a more global

deficit, with an estimated IQ of 73, or in the borderline mentally challenged range.  (*Id*.)  Plaintiff

also underwent a Neurobehavioral Cognitive Status Examination (COGNISTAT).[4]  (*Id*.)  The test

results showed that Plaintiff demonstrated some average cognitive abilities on 5 scales, and mild to

moderate impairment on 5 others.  (*Id*. at 429-30.)  He had moderate impairment in attention and

recalled 3 digits immediately, and for memory, he recalled 1 of 4 objects after a 10 minute delay.

(*Id*. at 429.)  Dr. Beaty determined that the results would be consistent with a condition that was

showing some decline as time moved forward.  (*Id*. at 430.)

Dr. Beaty also administered the Minnesota Multiphasic Personality Inventory-2 (MMPI-2).[5]

(*Id*.)  The findings were consistent with anxiety, depression, obsessive thoughts, compulsive

behaviors, somatic symptoms, and indecisiveness.  (*Id*.)  Dr. Beaty's diagnostic impressions

included major neurocognitive disorder due to traumatic brain injury with behavioral disturbance,

intermittent explosive disorder, social anxiety disorder, and major depression.  (*Id*. at 431.)  He

opined that a large part of Plaintiff's difficulty stemmed from his low frustration tolerance and

impulsivity, which prevented him from persevering and attempting to work through difficulties in

cognitive processing.  (*Id*.)  Plaintiff also had memory deficits primarily in delayed and recent

memory, and some days he did better than others.  (*Id*.)  His medications included Cymbalta for

depression and anxiety, Topiramate for headaches, and Memantine to slow the progression of

dementia.  (*Id*.)  Dr. Beaty ultimately opined that Plaintiff would not be able to hold a job

---

[4]  The COGNISTAT is a longer neurocognitive screening test which covers a range of cognitive abilities, including language, memory, and reasoning.  (doc. 10-1 at 429.)  It is often used as an assessment for dementia.  (*Id*.)

[5]  The MMPI-2 is a widely used and comprehensive measurement of personality and emotional factors.  (doc. 10-1 at 430.)

consistently from one day to the next, and that his impulsiveness and explosive anger would only lead to conflict and job loss.  (*Id*.)

### 3.     Hearing Testimony

On July 7, 2016, Plaintiff, his daughter (Daughter), and a vocational expert (VE) testified at a hearing before the ALJ.  (*Id*. at 4-72.)  Plaintiff was represented by an attorney.  (*Id*. at 40, 42.)

#### a.     *Daughter's Testimony*

Daughter testified that she lived with Plaintiff so that she could help take care of him while her mother was away for work during the week.  (*Id*. at 44.)  The family decided that someone should be with Plaintiff all day, after finding that he would leave appliances on and having to put a lock on the door to prevent him from going outside at night because he had been found sleeping outside.  (*Id*. at 45.)  She had awakened to find Plaintiff outside, and he would just fall asleep out there after he would forget what he was doing.  (*Id*.)  He had been found outside asleep in his underwear around May of the previous year, which led Daughter to move home.  (*Id*. at 46.)

Daughter and Plaintiff's wife would leave Plaintiff notes and lists of things to do for the day and reminders, such as instructions to feed the dogs or mow the lawn, and reminders to flush the toilet or take off all of his clothes before showering, because he would occasionally leave his socks on while showering.  (*Id*. at 46-47.)  Plaintiff read the notes and paid attention to them for the most part.  (*Id*. at 47.)  On days that Daughter was away from the house for work, neighbors would check on him, and Plaintiff was not allowed to wander or leave the house on those days.  (*Id*. at 48.)  Plaintiff would get lost when he would go get the mail, which was about 10 miles from the house, and people would see him and redirect him back home.  (*Id*. at 49-50.)  He most recently got lost about a month prior to the hearing.  (*Id*. at 50.)  On days that she was home with him, Plaintiff would

take care of the dogs and do a lot of yard work, such as mowing, weed eating, and watering the plants. (*Id*. at 51.) He would also use the computer and watch television. (*Id*.) She always tried to leave lists to keep Plaintiff occupied and prevent him from wandering off. (*Id*. at 52.)

Daughter stated that Plaintiff did not do well with people; he would get frustrated or angry easily, and he did not feel comfortable. (*Id*. at 53.) He did not have any anger control problems with family. (*Id*.) Due to his problems with people, Daughter tried to keep him away from crowds and did not take him places with a lot of people. (*Id*.) He had been in arguments or fights with individuals in his prior jobs. (*Id*.) Overall, Plaintiff had about 50 jobs in the previous 15 years, and he usually lost his jobs due to impulse control issues and anger, but also due to his forgetfulness. (*Id*. at 54.) For example, he forgot a simple procedure while working as an EMT, and they determined that he should not be working that job anymore. (*Id*.) Daughter noticed Plaintiff's anxiety and his frustration when he could not remember something. (*Id*. at 56.) She would take Plaintiff with her to the fire station where he could help with EMT classes and have some social interaction, but he did not participate in fighting fires. (*Id*.)

### b.    *Plaintiff's Testimony*

Plaintiff testified that he completed high school, was right handed, and had a driver's license, but Daughter drove him to the hearing that day. (*Id*. at 57.) He did not have any income; his wife worked. (*Id*. at 58.) He was a volunteer firefighter and would help with keeping the station clean and with the EMT classes. (*Id*.) Plaintiff stated that he had been fired from more than half of the jobs he ever had due to outbursts, physical altercations, and missing work. (*Id*. at 60.) At one job, he was fired for assaulting a customer, but charges had never been filed against him. (*Id*. at 61.) He also fought with contractors who were employed to rebuild his home, but he was not charged

16

with anything. (*Id.* at 61-62.) He only had one eye because of an accident when he was younger, and the vision in his eye was okay with "glasses and stuff," but medications were making it a lot more blurry. (*Id.* at 62.) He had problems with his anger since the accident. (*Id.*)

In his daily life, Plaintiff would mow the grass and water the flowers, as well as do tasks around the house based on the lists his wife and Daughter would leave. (*Id.* at 63-64.) He did not cook, but he could use the microwave. (*Id.* at 64.) At the fire station he swept the floor, cleaned, and helped with the EMT class, but he did not teach. (*Id.* at 64-65.) He did not smoke or use drugs, but he drank alcohol a couple of times a week, which helped him sleep sometimes. (*Id.* at 66.) He also did not have a criminal record. (*Id.*)

    **c.**  ***VE's Testimony***

The VE testified that Plaintiff had past work experience as a landscape specialist, DOT 406.687-010 (SVP 2, medium), automobile repair estimator, DOT 620.261-018 (SVP 7, light), tire salesperson, DOT 279.357-062 (SVP 5, medium), store laborer, DOT 922.687-058 (SVP 21, medium), and EMT technician, DOT 079.374-010 (SVP 5, medium). (*Id.* at 67-68.)

The ALJ asked the VE to consider a hypothetical individual of the same age, education, and work history as Plaintiff that had no exertional restrictions, but could not work at unprotected heights or with hazardous moving machinery, including no driving or operating motor vehicles as part of the job. (*Id.* at 69.) The individual had monocular vision and had to avoid jobs requiring depth perception or peripheral acuity to the right; would be limited to basic mental demands and competitive, unskilled work that would require the sustained ability to understand, remember, and carry out simple instructions; make simple work-related decisions; deal with changes in a routine work setting; and respond appropriately to supervision, coworkers, and usual work situations; but

17

would have no public interaction and social interaction with coworkers and supervisors would be limited to levels 7 and 8 as outlined in Appendix B to the DOT. (*Id*.) Math level demand would also be limited to the 5th grade level. (*Id*.)

The ALJ asked the VE if this hypothetical individual could perform any of Plaintiff's past work, and the VE responded that he could not. (*Id*. at 70.) When asked if there was any other work the hypothetical individual could perform, the VE responded that the hypothetical individual could work as a laundry laborer, DOT 361.687-018 (SVP 2, medium), with at least 13,000 jobs in the national economy; a box bender, DOT 641.687-010 (SVP 1, medium), with about 54,000 jobs in the national economy; and a laundry folder, DOT 369.687-018 (SVP 2, light), with at least 12,000 jobs in the national economy. (*Id*.) The ALJ asked the VE what the tolerance for unscheduled absences would be, and the VE responded that unscheduled absences are generally allowed 5-10 days per year. (*Id*. at 70-71.) The VE estimated that the tolerance for off-task behavior regardless of the reason would be about 15-20 percent of the time, and that exceeding those limits on a regular basis would eliminate the jobs in the competitive work setting. (*Id*.) The VE testified that her testimony was consistent with the DOT. (*Id*.)

## C.    **ALJ's Findings**

The ALJ issued a decision denying benefits on January 12, 2017. (*Id*. at 21-36.) At step one, she determined that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of January 26, 2015. (*Id*. at 23.) At step two, the ALJ found that Plaintiff had the following severe impairments: prosthetic right eye; vertigo; post-traumatic headaches; organic brain syndrome; neurocognitive disorder; dementia; major depressive disorder; social anxiety disorder; and intermittent explosive disorder. (*Id*.) Despite those impairments, at step three, the ALJ found that

Plaintiff had no impairments or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations. (*Id*. at 24.)

The ALJ then determined that Plaintiff retained the residual functional capacity (RFC) to perform a full range of work at all exertional levels, but with the following non-exertional limitations: avoid working at unprotected heights or with hazardous moving machinery; no driving or operating motor vehicles; and avoid jobs requiring depth perception or peripheral acuity to the right side due to monocular vision from prosthetic right eye. (*Id*. at 26.) Mentally, Plaintiff was capable of basic mental demands of competitive unskilled work, and could understand, remember, and carry out simple instructions; make simple work-related decisions; respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting. (*Id*.) He had a 5th grade level mathematics ability, could not interact with the public, and his social interaction with coworkers and supervisors could not exceed levels 7 and 8 as outlined in Appendix B to the Dictionary of Occupational Titles (DOT). (*Id*. at 27.)

At step four, the ALJ found that Plaintiff was unable to perform any of his past relevant work. (*Id*. at 34.) At step five, the ALJ found that transferability of job skills was not an issue because utilizing the Medical-Vocational Rules, he was not disabled whether or not he had transferable job skills, and considering his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that he could perform. (*Id*. at 35.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from January 26, 2015, through January 12, 2017. (*Id*. at 36.)

## II. LEGAL STANDARD

Judicial review of the commissioner's denial of benefits is limited to whether the

Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence supports the Commissioner's decision. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *Id.*

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last

for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*,

954 F.2d 189, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant

is disabled:

1.   An individual who is working and engaging in substantial gainful activity
     will not be found disabled regardless of medical findings.

2.   An individual who does not have a "severe impairment" will not be found to
     be disabled.

3.   An individual who "meets or equals a listed impairment in Appendix 1" will
     not be found to be disabled.

4.   If an individual is capable of performing the work he had done in the past, a
     finding of "not disabled" must be made.

5.   If an individual's impairment precludes him from performing his work, other
     factors including age, education, past work experience, and residual
     functional capacity must be considered to determine if work can be
     performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R.

§ 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(I)-(v)). Under the first four steps of the

analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis

terminates if the Commissioner determines at any point during the first four steps that the claimant

is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four

steps, the burden shifts to the Commissioner at step five to show there is other gainful employment

available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d

at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the

regulations, by vocational expert testimony, or other similar evidence.  *Froga v. Bowen*, 810 F.2d

1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step

21

review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III. ISSUES FOR REVIEW

Plaintiff presents two issues for review:

1.    The ALJ found that the Plaintiff has a number of severe impairments. She advised that a severe impairment limits an individual's ability to perform basic work activities. Yet, the ALJ failed to consider functional limitations resulting from these severe impairments in determining Plaintiff's residual functional capacity. Did the ALJ properly evaluate all of the Plaintiff's severe impairments in determining his residual functional capacity?

     The Plaintiff contends that the answer is "No."

2.    Medical Source Statements were provided by the treating primary care physician and by several examining specialists. The ALJ gave these opinions either "little weight," or failed to give these opinions "great weight." The Commissioner has established a procedure to evaluate the opinions of treating and examining physicians. Yet, the ALJ failed to apply the criteria specified therein in assessing these opinions or determining the weight which they deserve. Did the ALJ properly consider medical opinion evidence in establishing Plaintiff's residual functional capacity?

     The Plaintiff maintains that the answer is "No."

(doc. 13 at 2-3.)

### A.    RFC Determination

Plaintiff argues that the ALJ failed to consider all of his severe impairments in determining the functional limitations in his RFC. (doc. 13 at 8-9.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. 20 C.F.R. § 404.1545(a)(1). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2,

1996).  An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources.  20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.  The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). The ALJ may find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists.  *See* SSR 96-8p, 1996 WL 374184, at *1.  The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision or all the evidence that she rejected.  *Falco v. Shalala*, 27 F.3d 16, 164 (5th Cir. 1994).

A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record.  *Leggett*, 67 F.3d at 564.  Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings."  *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted).  Courts "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision.  *Id.*  Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence".  *See Johnson*, 864 F.2d at 343 (citations omitted).

Plaintiff contends that although the ALJ recognized post-traumatic headaches to be a severe

impairment, he failed to accommodate for such limitation in determining his RFC.  (doc. 13 at 8-9.)
He argues that Dr. LeCroy noted his history of headaches, that he reported that he had frequent
headaches to Dr. Beaty, and that migraine medications were not successful in controlling his
headaches.  (*Id*. at 8.)  He further argues that the ALJ did not determine how often he experiences
headaches, the effect of the headaches on his ability to perform work, and what measures Plaintiff
needed to take to address his headaches.  (*Id*. at 9.)

At step two, the ALJ found that Plaintiff had nine severe impairments, including post-
traumatic headaches.  (doc. 10-1 at 23.)  After finding that he did not have an impairment or
combination of impairments that met or medically equaled the severity of one of the listed
impairments in the regulations, the ALJ found that Plaintiff had the RFC to perform a full range of
work at all exertional levels, but he could not work at unprotected heights or with hazardous moving
machinery; could not drive or operate motor vehicles; and could not perform jobs requiring depth
perception or peripheral acuity to the right side.  (*Id*. at 26.)  The ALJ further determined that
Plaintiff was capable of basic mental demands of competitive unskilled work, and could understand,
remember, and carry out simple instructions; make simple work-related decisions; respond
appropriately to supervision, coworkers, and usual work situations; and deal with changes in a
routine work setting.  (*Id*.)  He then found that Plaintiff's mathematics ability was at the 5th grade
level, that he could not interact with the public, and that his social interaction with coworkers and
supervisors could not exceed levels 7 and 8 as outlined in Appendix B to the DOT.  (*Id*. at 27.)  In
making the RFC determination, the ALJ considered "all of the evidence with consideration of the
limitations and restrictions imposed by the combined effects of all [Plaintiff's] medically
determinable impairments."  (*Id*.)

The purpose of assessing a claimant's RFC is to determine the work that can be done despite present limitations. *See* 20 C.F.R. § 404.1545(a); *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001) (per curiam). Federal courts in Texas have found that when impairments are identified as severe at step two, but an RFC does not include any limitations, the RFC in effect contradicts the step two finding. *See Walker v. Colvin*, No. 3:14-CV-1498-L, 2015 WL 5836263, at *15 (N.D. Tex. Sept. 30, 2015) (citing cases); *Spears v. Barnhart*, 284 F. Supp. 2d 477, 483 (S.D. Tex. 2002) (noting that by failing to include any limitations, the ALJ "basically contradict[ed] the fact that he found [the claimant's] impairments to be severe"); *Norman v. Astrue*, No. SA-10-CA-849-XR, 2011 WL 2884894, at *6 (W.D. Tex. July 18, 2011) ("Similar to *Spears*, here the ALJ did not include any limitations resulting from the [impairment], contradicting his own finding that the [impairment] was 'severe.'"); *cf., Rangel v. Astrue*, No. H-08-2246, 2009 WL 2971129, at *15 & n.11 (S.D. Tex. Sept. 14, 2009) (contrasting the facts with *Spears*, the district court noted that the ALJ found the claimant's depression to be severe and assessed the appropriate mental limitations in his RFC determination for any residual effects of his depression). This inconsistency generally warrants remand. *See, e.g., Spears*, 284 F. Supp. 2d at 483–84 (finding the ALJ's failure to address the claimant's limitations related to her severe impairment was error that warranted remand); *Norman*, 2011 WL 2884894, at *6 (finding remand was warranted where the ALJ found the claimant's limitation was severe at step two, but failed to include any limitation resulting from the impairment in his RFC analysis); *Martinez v. Astrue*, No. 2:10-CV-0102, 2011 WL 4128837, at *7 (N.D. Tex. Sept. 15, 2011) (same), *adopted by*, 2011 WL 4336701 (N.D. Tex. Sept. 15, 2011).

For example, in *Martinez v. Astrue*, an ALJ failed to include limitations resulting from a plaintiff's hand surgery in the RFC despite finding that the hand surgery was a severe impairment.

25

*Martinez*, 2011 WL 4128837, at \*5–6.  After noting that the ALJ may have made a mistake at step two or made a credibility determination regarding the claimant's limitations in deciding the RFC, the court explained that "on appellate review, [a court] cannot speculate as to what the ALJ may have considered." *Id*. at \*7.  It remanded the case because it was unable to determine whether the ALJ intended the hand surgery to be a severe impairment, and if so, whether the RFC should have included certain limitations relating to it.  *Id*. at \*7 (noting "this Court cannot find that the ALJ's inclusion of the ... severe impairment was merely meaningless verbiage").

Nevertheless, "having a severe impairment is not a sufficient condition for receiving benefits under the Secretary's regulations" and "means only that [the] claimant has passed the second step of the inquiry mandated by the regulations." *Shipley v. Sec. of Health & Human Servs.*, 812 F.2d 934, 935 (5th Cir. 1987) (per curiam).  In other words, the consideration of whether a claimant's impairments are severe at step two is a different inquiry than an ALJ's assessment of the claimant's RFC.  *See Gutierrez v. Barnhart*, No. 04–11025, 2005 WL 1994289, at \*9 (5th Cir. Aug. 19, 2005) (per curiam) ("A claimant is not entitled to social security disability benefits merely upon a showing that she has a severe disability. Rather, the disability must make it so the claimant cannot work to entitle the claimant to disability benefits."); *see also Boyd v. Apfel*, 239 F.3d 698, 706 (5th Cir. 2001) ("The ALJ's finding that [the claimant] had a 'combination of impairments that [were] severe' did not foreclose a finding that [the claimant] had a residual functional capacity to perform a range of light work, and is not necessarily inconsistent with that finding."); *Quigley v. Astrue*, No. 4:09-CV-402-A, 2010 WL 5557500, at \*8 (N.D. Tex. Sept. 8, 2010) (noting that step two and the RFC determination are different inquiries), *adopted by*, 2011 WL 61630 (N.D. Tex. Jan 5, 2011).

In cases where reviewing courts have found that an ALJ did not err in finding severe

impairments at step two and not attributing any limitation to those impairments in the RFC assessment, the ALJs considered the limitations that were encompassed by the severe impairments or accounted for the limitations in some respect before making a disability finding. *See, e.g.,* *Gonzalez v. Colvin*, No. 4:12-CV-641-A, 2014 WL 61171, at *6-7 (N.D. Tex. Jan. 6, 2014) (finding the ALJ's decision was not subject to reversal where he did not set forth specific limitations in his RFC determination relating only to the claimant's severe impairment but found other limitations that took into account the claimant's severe impairment); *Carnley v. Colvin*, No. 3:12-CV-3535-N, 2013 WL 5300674, at *9 (N.D. Tex. Sept. 20, 2013) (finding although the ALJ erred by finding claimant's seizure disorder to be a severe impairment and failing to incorporate limitations from the disorder into the RFC, it was clear he intended to include seizure limitations because the hypothetical questions posed to the VE at the hearing included such limitations, so there was no need to remand the case); *Scott v. Colvin*, No. 4:12-CV-01569, 2013 WL 6047555, at *11 (S.D. Tex. Nov. 14, 2013) (finding that the ALJ "fully addressed the impact of [the claimant's severe impairment] on her ability to do sustained work activities").

In making the RFC determination, the ALJ discussed Plaintiff's reports of headaches that responded to a combination of Advil and baby aspirin. (doc. 10-1 at 29, 31-33.) She further noted that Plaintiff was provided medication for migraines that did not work; Dr. Adams had indicated that if the medication failed to work, it would confirm that Plaintiff did not have migraines. (*Id.* at 33.) Although the ALJ acknowledged that the medical and testimonial evidence of record supported a finding that Plaintiff experienced post-traumatic headaches, she also acknowledged that Plaintiff led a very active lifestyle at home and therefore did not require any exertional limitations. (doc. 10-1 at 34.) The ALJ was aware of and specifically discussed Plaintiff's headaches "but did not find that

substantial evidence in the record supported including any specific limitations in the RFC determination for such impairment." *Kozlowski v. Colvin*, No. 4:16-CV-020-A, 2014 WL 948653, at *6 (N.D. Tex. Mar. 11, 2014).   Her findings are supported by the evidence of record that showed that even though Plaintiff reported suffering from headaches, over-the-counter medication provided him relief, and he was very active at home and consistently volunteered at the fire station.  (*Id*. at 51, 58, 63-65, 246, 248-49, 389, 428.)  Additionally, "[n]o examining or consulting physician has ever opined that Plaintiff's headaches . . .  would impact [his] ability to perform work-related activities beyond the limitations indicated in the ALJ's residual functional capacity assessment." *McKinney v. Colvin*, No. 3:13-CV-900HTW-LRA,2014 WL 652948, at *7 (S.D. Miss. Feb. 19, 2014) (citing *Bordelon v. Astrue*, 281 F. App'x 418, 422 (5th Cir. 2008)).

The decision does not show that the ALJ failed to consider Plaintiff's headaches in determining his RFC; rather, it shows that she fulfilled her role as the finder of fact to weigh the evidence in the record, resolve all conflicts in the evidence, and make an administrative assessment of his ability to work.  *See Kozlowski*, 2014 WL 948653, at *6 (determining that the ALJ did not err by not including specific limitations for carpal tunnel syndrome even though it was found to be a severe impairment at step two); *McKinney*,2014 WL 652948, at *7 (finding that the ALJ did not err by not including limitations from the plaintiff's headaches, hypertension, obesity, and history of stroke in her RFC despite finding those impairments to be severe at step two); *see also Dise v. Colvin*, 630 F. App'x 322, 326 (5th Cir. 2015) (holding that a "diagnosis is not, itself, a functional limitation").  Accordingly, the ALJ did not err, and remand is not required on this issue.

**B.**     **Medical Source Opinion**

Plaintiff next contends that the ALJ failed to give due consideration to the medical opinion

evidence from Dr. Beaty and Dr. LeCroy in determining his RFC.  (doc. 13 at 9-11.)

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence.  20 C.F.R. §§ 404.1520b(b) and 404.1527(c).  Every medical opinion is evaluated regardless of its source.  *Id*. at § 404.1527(c)(1).  Generally, an opinion from an examining source is given more weight than the opinion from a non-examining source.  *Id*.  However, the "standard of deference to the examining physician is contingent upon the physician's ordinarily greater familiarity with the claimant's injuries. [W]here the examining physician is not the claimant's treating physician and where the physician examined the claimant only once, the level of deference afforded his opinion may fall correspondingly." *Rodriguez v. Shalala*, 35 F.3d 560 (5th Cir. 1994) (unpublished) (citing *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)).  The ALJ is also free to reject the medical opinion of any physician when the evidence supports a contrary conclusion.  *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1981).  Moreover, "[w]hen a treating or examining physician's opinions are inconsistent with other substantial evidence in the record, the opinions are not entitled to any specific weight in the ALJ's decision." *Smith v. Comm'r of Soc. Sec. Admin.*, No. 4:12-CV-00625-DDB, 2014 WL 4467880 at *3 (E.D. Tex. Sept. 9, 2014).

### 1.     Dr. Beaty

Plaintiff argues that the ALJ failed to properly consider the medical opinion evidence from Dr. Beaty.  (*Id*. at 9.)

Dr. Beaty completed a psychological evaluation during which Plaintiff and his daughter discussed his symptoms and daily activities.  (doc. 10-1 at 426-31.)  Plaintiff appeared disoriented and was not very communicative at first, so his daughter initially did most of the talking, but Plaintiff eventually began talking more.  (*Id*. at 428.)  Dr. Beaty noted that Plaintiff's doctors had

diagnosed him with organic brain syndrome and chronic traumatic encephalopathy, which were getting worse. (*Id*. at 427.) Dr. Beaty administered several tests, and his diagnostic impressions included major neurocognitive disorder due to traumatic brain injury with behavioral disturbance, intermittent explosive disorder, social anxiety disorder, and major depression. (*Id*. at 431.) He found that much of Plaintiff's difficulty stemmed from his low frustration tolerance and impulsivity, which prevented him from persevering and attempting to work through difficulties in cognitive processing, and that Plaintiff had memory deficits primarily in delayed and recent memory. (*Id*.) He ultimately opined that Plaintiff would not be able to hold a job consistently from one day to the next, and that his impulsiveness and explosive anger would only lead to conflict and job loss. (*Id*.)

The ALJ's findings included a detailed description of Dr. Beaty's opinion. (*Id*. at 31-32.) She noted that Plaintiff underwent testing and discussed the results of those tests, including Dr. Beaty's assessment that Plaintiff had major neurocognitive disorder due to a traumatic brain injury with behavior disturbance, intermittent explosive disorder, social anxiety disorder, and major depression. (*Id*.) She also noted Dr. Beaty's recommendation that Plaintiff undergo psychotherapy, as well as his opinion that Plaintiff could not consistently hold a job due to his impulsivity and explosive anger. (*Id*. at 32.) The ALJ found that "some but not great weight" should be afforded to his opinions because a "significant component of the negativity within the report [came] from self-reports of [Plaintiff] and [his] daughter rather than the objective observations." (*Id*. at 32.) The ALJ ultimately found that the assessed mental RFC accommodated for Plaintiff's "need for social limitations, mood problems, and cognitive issues." (*Id*.)

Plaintiff appears to argue that the ALJ should have given more weight to Dr. Beaty's opinion that he could not consistently hold a job because his conclusions were based "not only upon the

interview with [Plaintiff] and his daughter, but [also] the results of diagnostic testing." (doc. 13 at 9.) The ALJ did, however, consider all of the results from Dr. Beaty's evaluation, and she integrated his findings into her determination of Plaintiff's mental RFC limitations. (doc. 10-1 at 32.) Specifically, the ALJ determined that Plaintiff had the mental RFC to perform the basic mental demands of competitive unskilled work, and to understand, remember, and carry out simple instructions; make simple work-related decisions; respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting. (*Id*. at 26-27.) She also determined that Plaintiff could have limited social interaction with coworkers and supervisors not to exceed levels 7 and 8 as outlined in Appendix B to the DOT, and that he could not interact with the public. (*Id*. at 27.)

By explaining that the assessed mental RFC accounted for the limitations found by Dr. Beaty and determining that Plaintiff could perform other work, the ALJ properly rejected Dr. Beaty's opinion that he could not consistently hold a job. *See Meyer v. Barnhart*, 163 F. App'x 347, 347–48 (5th Cir. 2006) (finding no error when the ALJ gave "significant weight" to a clinical examiner's medical opinion and then appeared to have "implicitly rejected [that examiner's] opinion that [the plaintiff] need[ed] the opportunity to change positions at will"); *see also Grant v. Colvin*, No. 3:13-CV-2303-B, 2014 WL 4626305, at *2 (N.D. Tex. Sept. 16, 2014) (finding no error when the ALJ "implicitly rejected [a consultative examiner's] opinions and determined that [the plaintiff] had the RFC for the full range of medium work"). The evidence of record provides substantial evidence to support the ALJ's finding that the mental limitations assessed in Plaintiff's RFC accounted for Dr. Beaty's findings.

The ALJ did not err by giving only "some but not great weight" to Dr. Beaty's opinions, and

there is substantial evidence to support the exclusion of his opinion that Plaintiff could not consistently hold a job. As the trier of fact, the ALJ was entitled to weigh the evidence against other objective findings, including the opinion evidence available and the record as a whole. A reviewing court must therefore defer to the ALJ's decisions. *See Leggett*, 67 F.3d at 564. Accordingly, the ALJ properly considered Dr. Beaty's medical opinion evidence, and remand is not required on this issue.

### 2.     *Dr. LeCroy*

Plaintiff also argues that the ALJ failed to evaluate Dr. LeCroy's treating source opinion under the factors set forth in 20 C.F.R. § 404.1527(c), "refer to evidence from a treating source which would contravene the opinion of Dr. LeCroy," or consider that Dr. Lecroy's opinions were consistent with the opinions of Dr. Beaty and Dr. Taylor. (doc. 13 at 10-11.)

As noted, the Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. §§ 404.1520b(b) & 404.1527(c). Although every medical opinion is evaluated regardless of its source, the Commissioner generally gives greater weight to opinions from a treating source. 20 C.F.R. § 404.1527(c)(2). A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant. *Id.* at § 404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give that opinion controlling weight. *Id.* at § 404.1527(c)(2). If controlling weight is not given to a treating source's opinion, the Commissioner

considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id.* at § 404.1527(c)(1)–(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). If evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id.* A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id.* at 455–56. Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [then] 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453. A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458.

Here, Dr. LeCroy was Plaintiff's primary care physician and met with him 2-3 times per year since 2013. (*See id.* at 326, 337.) He stated that Plaintiff was unable to work, and would require

33

accommodations for his difficulty in social interaction, direct supervision, memory loss, trouble following directions, and having 3 or more sick days per month.  (*Id*. at 332.)   He also completed an RFC form for Plaintiff and diagnosed him with organic brain syndrome that had been managed for many years, depression on an ongoing basis, and "probably some amount of anger and irritability." (*Id*. at 326.) He did not expect any significant improvement and suspected that Plaintiff would have ongoing mild decline.  (*Id*. at 327.)  He opined that Plaintiff could stand for 6-8 hours or sit upright for 6-8 hours, and he did not have to lie down during the day.  (*Id*. at 327-28.)  Plaintiff could lift, pull, and hold objects, and that he did not have any limitations in bending, squatting, kneeling, or turning any parts of his body.  (*Id*. at 329.)  He did not think that Plaintiff's disability would prevent him from traveling alone because new technology for directions could give him years of independent driving.  (*Id*.)  Dr. LeCroy ultimately opined that Plaintiff would not be able to continue or resume work at his current or previous employment because his symptoms would not get better, and he was a danger to the public in his condition.  (*Id*. at 330.)  He also could not identify any other work Plaintiff could do and opined that his disability was not likely to change.  (*Id*.)  Dr. LeCroy then completed a mental status report for Plaintiff and diagnosed him with organic brain syndrome with no hope of improvement.  (*Id*. at 385-87.)  He added that Plaintiff's condition would increasingly impair his ability to respond to workplace changes and stress.   (*Id*. at 387.) Additionally, Plaintiff did "very poorly" on a formal psychological test, and Dr. LeCroy opined that Plaintiff was disabled and nothing could be done to improve his condition.  (*Id*. at 410-11.)

The ALJ specifically reviewed the evidence of Dr. LeCroy and noted that none of his opinions "provided a function-by-function assessment of [Plaintiff's] ability to perform work-related mental tasks."  (*Id*. at 30-31.)  She further noted that "the issue of disability or inability to work is

34

reserved to the Commissioner and, therefore," it was beyond the scope of Dr. LeCroy's expertise to determine whether Plaintiff was disabled. (*Id*. at 31.) The ALJ also found that there was no objective evidence to support the frequency of absences assessed by Dr. LeCroy or his finding that Plaintiff would forget even simple procedures and tasks. (*Id*.) She ultimately gave some weight to Dr. LeCroy's opinion that Plaintiff could not perform work as an EMT, but gave the remainder of his opinions little weight. (*Id*.)

The ALJ also discussed and examined the medical opinions concerning Plaintiff's impairments of three other examining physicians, *i.e.*, Drs. Taylor, Beaty, and Adams. (*Id*. at 29, 31-33.) She gave great weight to Dr. Taylor's assessment of Plaintiff's cognitive impairments because it reflected "objective results from standardized testing and [was] generally consistent with objective findings elsewhere in treatment notes." (*Id*. at 29.) She then found that Dr. Beaty's opinions were entitled to "some but not great weight" and accounted for his findings in Plaintiff's mental RFC after determining, as noted, that a large part of his negative findings were based on self-reports from Plaintiff and his daughter rather than on objective observations. (*Id*. at 31-32.) She also noted Dr. Adams' finding that the intermittent nature of Plaintiff's symptoms argued against frontotemporal dementia or Alzheimer's. (*Id*. at 33.) Although Plaintiff argues that Dr. LeCroy's opinions are consistent with the findings by Drs. Taylor and Beaty, the ALJ's decision reflected that there was no objective evidence to support the frequency of absences assessed by Dr. LeCroy or his finding that Plaintiff would forget even simple procedures and tasks. (*See id*. at 31.)

Because the ALJ relied on competing first-hand medical evidence when he declined to give Dr. LeCroy's medical opinions controlling weight and explained her reasons for assigning his opinions little weight, her decision was based on substantial evidence, and she was not required to

35

conduct a full factor-by-factor analysis. *See Belk v. Colvin*, 648 F. App'x 452, 455 (5th Cir. 2016) (per curiam) ("Conflicts of evidence are for the Commissioner to resolve; in applying the substantial evidence standard, we do not reweigh the evidence, but merely determine whether the Commissioner's decision is supported by substantial evidence.") (citing *Perez*, 415 F.3d at 461); *see, e.g., Wells v. Colvin*, No. 3:15-CV-3759-BK, 2016 WL 4920289, at *4 (N.D. Tex. Sept. 15, 2016) (affirming the ALJ's decision because "the doctor's opinion on the checklist form was inconsistent with and unsupported by the other substantial evidence of record, including [her] own treatment notes").[6]

The ALJ did not err in her consideration of the medical opinion evidence from Drs. Beaty or LeCroy, and remand is not required on this issue.

## IV. RECOMMENDATION

The Commissioner's decision should be **AFFIRMED**.

**SO RECOMMENDED** on this 26th day of February, 2019.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[6] Although Plaintiff also appears to argue that the ALJ should have contacted Dr. LeCroy "to obtain clarification of his views and to obtain a copy of the psychological testing report" as part of her "affirmative duty . . . to develop the complete medical history," he does not expressly raise an issue regarding the ALJ's duty to develop the record. (doc. 13 at 10.)

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE